GREGORY O'HARA (SBN: 131963)
gohara@nixonpeabody.com
NIXON PEABODY LLP
Two Palo Alto Square
3000 El Camino Real, Suite 500
Palo Alto, California 94306
Telephone:  (650) 320-7700
Facsimile:  (650) 320-7701

JOHN R. FOOTE (SBN: 99674)
jfoote@nixonpeabody.com
KARL K. SUNG (SBN: 294120)
ksung@nixonpeabody.com
NIXON PEABODY LLP
One Embarcadero Center, 18th Floor
San Francisco, California 94111
Telephone:  (415) 984-8200
Facsimile:  (415) 984-8300

*Attorneys for Defendants Michael Shemali, Wines of the World, LLC, Tri Cities Liquor & Spirits, LLC, Belmont Wine Exchange, LLC, Matt Myers, Hi-Time Wine Cellars, Sandra Rodriguez, Eduardo Rodriguez, and Sandi's Pet Place Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| H.P.D. CONSOLIDATION, INC. dba VALLEY WINE WAREHOUSE,<br><br>Plaintiff<br><br>v.<br><br>JOSE PINA aka JOSE LUIS PIEDRA, *et al.*<br><br>Defendants. | Case No. 3:15-cv-5309 EMC<br><br>**CERTAIN DEFENDANTS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES UNDER 28 U.S.C. § 1927 AND THIS COURT'S INHERENT POWER, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing:     January 19, 2017<br>Time:         1:30 p.m.<br>Before:       Honorable Edward M. Chen |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION .................................................................................. 1

POINTS AND AUTHORITIES IN SUPPORT OF MOTION ............................................... 2

I.   INTRODUCTION ......................................................................................................... 2

II.   STATEMENT OF LAW ............................................................................................... 3

    A.   LEGAL STANDARD FOR SANCTIONS UNDER SECTION 1927 ..................... 3

    B.   LEGAL STANDARD FOR SANCTIONS UNDER COURT'S INHERENT POWER ........................................................................................................ 4

    C.   SANCTIONS IN RICO ACTIONS, GENERALLY ............................................. 5

    D.   JURISDICTION ............................................................................................. 6

III.   PROCEDURAL HISTORY .......................................................................................... 6

IV.   ARGUMENT ............................................................................................................... 8

    A.   PLAINTIFF'S COMPLAINTS ARE FACTUALLY BASELESS ......................... 9

        1.   Shemali's Unknowing Purchase and Resale of Plaintiff's Wine ................. 9

        2.   Discussions and Agreements Between Shemali and Plaintiff .................... 11

        3.   Discussions and Agreement Between BWE and Plaintiff ......................... 12

        4.   Mr. Ryan's "Factual" Allegations Are Frivolous ................................... 12

            a.   Original Complaint, FAC and SAC ............................................. 13

            b.   Paragraph 22(e) of SAC ............................................................ 14

            c.   Paragraph 22(h) of SAC ............................................................ 14

            d.   Paragraph 22(i) of SAC ............................................................ 15

            e.   Paragraph 22(p) of the SAC ....................................................... 15

            f.   Paragraphs 22(p) and (r) of the SAC .......................................... 16

            g.   Paragraph 21(b) of FAC ............................................................ 16

            h.   Paragraph 21(d) of FAC ............................................................ 17

        5.   Mr. Ryan's Flip-Flopping Allegations ................................................. 17

    B.   PLAINTIFF'S COMPLAINTS ARE LEGALLY BASELESS ............................. 19

i

1      1.   Mr. Ryan Disregards RICO Law ................................................................... 19

2      2.   Mr. Ryan Disregards the Law Regarding Each Alleged Predicate Act ....... 21

3       a.   Interstate Transportation of Stolen Goods – 18 U.S.C. § 2315 ........ 22

4       b.   Mail Fraud – 18 U.S.C. 1341 .......................................................... 22

5    C.   ATTORNEY'S FEES ............................................................................ 23

6 V.   CONCLUSION ................................................................................................. 25

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTAIN DEFENDANTS' MOTION FOR ATTORNEY'S FEES

Case No. 3:15-cv-5309 EMC

4832-7220-2045

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Apple, Inc. v. Samsung Electronics Co.,*
  C 11–1846 LHK PSG, 2012 WL 5451411 (N.D. Cal. Nov. 7, 2012) .................................... 23

*B.K.B. v. Maui Police Dep't,*
  276 F.3d 1091 (9th Cir. 2002) ....................................................................................... 3, 4, 5

*Barber v. Miller,*
  146 F.3d 707 (9th Cir. 1998) ................................................................................................. 4

*Bernardi v. Yeutter,*
  951 F.2d 971 (9th Cir. 1991) ............................................................................................... 23

*Berry v. Urban Outfitters Wholesale, Inc.,*
  No. 13-CV-02628JSW (KAW), 2015 WL 580579 (N.D. Cal. Feb. 11, 2015) ...................... 23

*Burnette v. Godshall,*
  828 F. Supp. 1439 (N.D. Cal. 1993) ................................................................................. 5, 19

*Camacho v. Bridgeport Fin., Inc.,*
  523 F.3d 973 (9th Cir. 2008) ............................................................................................... 23

*Chambers v. Whirlpool Corp.,*
  No. CV111733FMOJCGX, 2016 WL 5922456 (C.D. Cal. Oct. 11, 2016) ........................... 23

*Commercial Space Mgmt. Co. v. Boeing Co.,*
  193 F.3d 1074 (9th Cir. 1999) ............................................................................................... 6

*Counts v. Meriwether,*
  2016 WL 1165888 (C.D. Cal. 2016) ................................................................................... 24

*Davis v. Hudgins,*
  896 F. Supp. 561 (E.D. Va. 1995), *aff'd,* 87 F.3d 1308 (4th Cir. 1996) .................................. 5

*Fallay v. S.F.City & Cty.,*
  No. C 08-2261 CRB, 2016 WL 879632 (N.D. Cal. Mar. 8, 2016) ........................................ 23

*Fallbrook Union High Sch. Dist. v. Christopher S.,*
  No. 08CV49-LAB (CAB), 2008 WL 595849 (S.D. Cal. Feb. 29, 2008) ................................. 6

*Figueroa Ruiz v. Alegria,*
  896 F.2d 645 (1st Cir. 1990) ................................................................................................. 5

*Fink v. Gomez,*
  239 F.3d 989 (9th Cir.2001) ................................................................................................. 4

iii

*Fred A. Smith Lumber Co. v. Edidin*,
   845 F.2d 750 (7th Cir. 1988) ........................................................................5

*Gates v. Rowland*,
   39 F.3d 1439 (9th Cir. 1994) ......................................................................23

*Gutierrez v. Wells Fargo Bank, N.A.*,
   2015 WL 2438274 (N.D. Cal. May 21, 2015)............................................24

*Holgate v. Baldwin*,
   425 F.3d 671 (9th Cir. 2005) ........................................................................4

*Impactoffice LLC v. Hard*,
   No. CV DKC 16-1675, 2016 WL 6600547 (D. Md. Nov. 8, 2016).........6

*In re Girardi*,
   611 F.3d 1027 (9th Cir. 2010) ..................................................................3, 4

*Katzman v. Victoria's Secret Catalogue*,
   167 F.R.D. 649 (S.D.N.Y. 1996), *aff'd sub nom.*, 113 F.3d 1229 (2d Cir. 1997) .........5, 19, 20

*Mohebbi v. Khazen*,
   50 F. Supp. 3d 1234, 1257 (N.D. Cal. 2014)..............................................7

*Moore v. Keegan Mgmt. Co*,
   78 F.3d 431 (9th Cir. 1996) ..........................................................................4

*Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*,
   806 F.2d 291 (1st Cir.1986) .........................................................................5

*Prison Legal News v. Schwarzenegger*,
   608 F.3d 446 (9th Cir. 2010) ......................................................................24

*Rodriguez v. Cty. of L.A.*,
   96 F. Supp. 3d 1012, 1024 (C.D. Cal. 2014) .......................................23, 24

*Ruch v. AM Retail Grp., Inc.*,
   No. 14-CV-05352-MEJ, 2016 WL 5462451 (N.D. Cal. Sept. 28, 2016)..............................24

*Segarra v. Messina*,
   153 F.R.D. 22 (N.D.N.Y.) ...........................................................................5

*Townsend v. Holman Consulting Corp.*,
   929 F.2d 1358 (9th Cir. 1990) ......................................................................4

*U.S. v. Rico*,
   619 F. App'x 595 (9th Cir. 2015)..............................................................3, 4

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
   896 F.2d 403 (9th Cir. 1990) ......................................................................23

iv

*Welch v. Metro. Life Ins. Co.*,
   480 F.3d 942 (9th Cir. 2007) ...............................................................................23

## FEDERAL STATUTES

18 U.S.C. § 1341 ...............................................................................................19, 22

18 U.S.C. § 1344 ...............................................................................................19, 22

18 U.S.C. § 1503 ......................................................................................................19

18 U.S.C. § 1510 ......................................................................................................19

18 U.S.C. § 1511 ......................................................................................................19

18 U.S.C. § 1512 ......................................................................................................19

18 U.S.C. § 1513 ......................................................................................................19

18 U.S.C. §§ 1581–1588 .........................................................................................19

18 U.S.C. § 1962 ................................................................................................passim

18 U.S.C. § 2315 ...............................................................................................19, 22

18 U.S.C. § 2319 ......................................................................................................19

18 U.S.C. § 2320 ......................................................................................................19

28 U.S.C. § 1927 ................................................................................................passim

## FEDERAL RULES

Rule 8 of the Federal Rules of Civil Procedure ..........................................................2

Rule 9 of the Federal Rules of Civil Procedure ........................................................22

Rule 11 of the Federal Rules of Civil Procedure ...............................................passim

Rule 41 of the Federal Rules of Civil Procedure ........................................................6

4832-7220-2045

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on January 19, 2017, Defendants Michael Shemali ("Shemali"), Wines of the World, LLC ("WOW"), Tri Cities Liquor & Spirits, LLC ("Tri Cities"), Belmont Wine Exchange, LLC ("BWE"), Hi-Time Wine Cellars ("Hi-Time"), Matt Myers ("Myers"), Sandra Rodriguez and Eduardo Rodriguez ("Rodriguezes"), and Sandi's Pet Place Inc. ("Sandi's") (collectively, "Certain Defendants"), through their undersigned counsel of record, will and hereby do move the Court for an Order granting monetary sanctions in the form of attorney's fees in the amounts specified herein against: (1) Plaintiff H.P.D. Consolidation, Inc. ("HPD" or "Plaintiff"), HPD's counsel Russell K. Ryan ("Mr. Ryan"), and/or Mr. Ryan's law firm, Motschiedler, Michaelides, Wishon, Brewer & Ryan, LLP ("MMWBR"), pursuant to the Court's inherent authority; and/or (2) Mr. Ryan, pursuant to 28 U.S.C. § 1927 ("Section 1927").

Certain Defendants make this Motion on the grounds that the filing and prosecution of this entire action was done in bad faith, and that Mr. Ryan's continuation of this case after Certain Defendants filed their original motion to dismiss, beginning with his filing of the First Amended Complaint (Dkt. No. 89) ("FAC"), not only was done in bad faith but also constitutes an unreasonable and vexatious multiplication of the proceedings in this action.  Certain Defendants base this Motion on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the supporting Declarations of John R. Foote, Michael Shemali, Matt Myers, John Khouri, Diana Hirst, and Eduardo Rodriguez filed herewith, and any additional evidence or argument that may be submitted prior to or at the hearing on this motion.

Dated:  December 12, 2016                    NIXON PEABODY LLP


By:  _____*/s/ John R. Foote*_____
     GREGORY O'HARA (SBN: 131963)
     JOHN R. FOOTE (SBN: 99674)
     KARL K. SUNG  (SBN: 294120)
     Attorneys for Certain Defendants

## POINTS AND AUTHORITIES IN SUPPORT OF MOTION

## I.    INTRODUCTION

Certain Defendant Shemali purchased wine from Defendant David Borges ("Borges") during February and March of 2014, not knowing it had been stolen from Plaintiff HPD's warehouse, and sold or delivered that wine to other of the Certain Defendants.  Within days after Shemali learned that the wine had been stolen, he was in contact with the President of Plaintiff HPD, Peter Stravinski ("Stravinski"), and had entered into an oral agreement with him to help HPD recover its stolen wine.  According to Stravinski, this agreement would "**completely demonstrate that none of us knowingly traffics in stolen property**."   One week later, Shemali met with Stravinski and HPD's counsel, Carl Motschiedler ("Motschiedler"), the founder of Mr. Ryan's law firm, MMWBR.  At that meeting, Shemali told Stravinski and Motschiedler everything he knew about his purchases of wine from Defendant Borges and his resale of some of that wine to other Certain Defendants.  Never during this meeting nor in numerous communications during the following months did Stravinski or Motschiedler ever accuse Shemali or any of the other Certain Defendants of knowing that the wine that had been purchased from Defendant Borges had been stolen.  Rather, Stravinski offered to loan Shemali up to $132,000 to repay the Certain Defendants to whom Shemali had resold the wine.  Nonetheless, 18 months later HPD, represented by Motschiedler and Mr. Ryan's law firm, MMWBR, filed this action against Shemali and the other Certain Defendants, alleging that they had all been participants in a "wine theft ring" that had been formed up to three years before Shemali had ever even heard of Defendant Borges.  The only imaginable explanation for HPD and its counsel pursuing this lawsuit against Certain Defendants is that they sought in bad faith to extract nuisance settlements.

Mr. Ryan has been the MMWBR partner solely or primarily responsible for prosecuting this frivolous action.  Mr. Ryan filed three complaints, all of which utterly failed to satisfy Rule 8(a)'s pleading standards for essentially every single element of his 18 U.S.C. § 1962 ("RICO") claims.  Moreover, Mr. Ryan had no evidentiary basis on which to make many of the "factual" allegations in those complaints.  Indeed, Mr. Ryan played fast and loose with his alleged "facts," materially changing them each time he amended his complaint.  Given the discussions that

Stravinski and Motschiedler had with Shemali, Mr. Ryan knew or should have known the frivolous and reckless nature of his "factual" allegations.  Moreover, after receiving Certain Defendants' motion to dismiss his original complaint, Mr. Ryan knew or should have known that he could not successfully allege any RICO claim.  Nonetheless, he continued to multiply the proceedings.  Indeed, Mr. Ryan's culpability in this regard is confirmed by the fact that, once he was put personally at risk by Certain Defendants' motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure ("Rule 11"), he voluntarily dismissed the action to avoid those sanctions.

Because HPD and its counsel initiated and pursued this action in bad faith, and Mr. Ryan unreasonably and vexatiously multiplied the proceedings in this action, Certain Defendants seek an order imposing monetary sanctions on HPD, MMWBR, and/or Mr. Ryan pursuant to this Court's inherent authority and/or a similar order against Mr. Ryan pursuant to Section 1927.  Such an order is both justified and necessary in order to deter any such future misconduct and compensate Certain Defendants for the fees they have incurred in defending against this frivolous action.

## II.   STATEMENT OF LAW

### A.   LEGAL STANDARD FOR SANCTIONS UNDER SECTION 1927

Pursuant to Section 1927, "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  The Ninth Circuit has repeatedly held that Section 1927 sanctions may be imposed when counsel "recklessly raises a frivolous argument which resulted in the multiplication of the proceedings." *In re Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010).  "Recklessness," in the context of Section 1927, may be understood as "a departure from ordinary standards of care that disregards a known or obvious risk of material misrepresentation." *Id.* at 1038 n.4.  "Frivolousness," in the context of Section 1927, "should be understood as referring to legal or factual contentions so weak as to constitute objective evidence of improper purpose." *Id.* at 1062.  Additionally, "a finding that the attorney recklessly or intentionally misled the court is sufficient to impose sanctions under § 1927." *Id.*  "Recklessness plus knowledge" also warrants Section 1927 sanctions. *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1107 (9th Cir. 2002); *U.S. v. Rico*, 619 F. App'x 595, 601 (9th Cir. 2015).

3

4832-7220-2045

Counsel may also be subject to Section 1927 sanctions for "recklessly making frivolous filings." *Girardi*, 611 F.3d at 1068.  A "frivolous filing" is shorthand for a filing that "is *both* baseless and made without a reasonable and competent inquiry." *Id.* (emphasis in original) (*citing Moore v. Keegan Mgmt. Co*, 78 F.3d 431, 434 (9th Cir. 1996) (construing "frivolous filing" in the context of Rule 11)).  When a complaint is the primary focus of a proceeding for sanctions, as is here, the court must conduct a two-prong test to determine: "(1) whether the complaint is legally or factually baseless from an objective perspective, and (2) if the attorney has conducted a reasonable and competent inquiry before signing and filing it." *Holgate v. Baldwin*, 425 F.3d 671, 675-76 (9th Cir. 2005).  "A district court confronted with solid evidence of a pleading's frivolousness may in circumstances that warrant it infer that it was filed for an improper purpose." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1365 (9th Cir. 1990).

**B.      LEGAL STANDARD FOR SANCTIONS UNDER COURT'S INHERENT POWER**

Sanctions imposed under the Court's inherent power require a finding of bad faith or conduct tantamount to bad faith.  *See U.S. v. Rico*, 619 F. App'x 595, 601 (9th Cir. 2015).  "Bad faith is present when an attorney knowingly *or* recklessly raises a frivolous argument." *See Keegan*, *supra*, 78 F.3d at 436 (emphasis added); *see also B.K.B.*, 276 F.3d at 1108 ("counsel's reckless and knowing conduct in this case was tantamount to bad faith and therefore sanctionable under the court's inherent power") (emphasis omitted).  Indeed, the test for sanctions under the Court's inherent power and Section 1927 "requires similar, if slightly different, determinations." *See U.S. v. Rico*, 619 F. App'x 595, 601 (9th Cir. 2015); *see also Barber v. Miller*, 146 F.3d 707, 711 (9th Cir. 1998) ("An award of sanctions under 28 U.S.C. § 1927 or the district court's inherent authority requires a finding of recklessness *or* bad faith.") (emphasis added); *Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir.2001) (holding that, under the court's inherent power, "[s]anctions are available for … recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose").

Unlike Section 1927, however, sanctions under the Court's inherent authority *does not* require the multiplication of proceedings.  Hence, a defendant typically cannot receive attorney's fees based on a reckless and frivolously filed *initial* compliant under Section 1927, but can under

4

4832-7220-2045

the Court's inherent authority.  Additionally, attorney misconduct can warrant sanctions under both Section 1927 and the court's inherent authority.  *See B.K.B.*, 276 F.3d at 1106-09 (affirming award of $5,000 in sanctions under Section 1927, and another $5,000 under the court's inherent power).

## C.   SANCTIONS IN RICO ACTIONS, GENERALLY

"A civil RICO suit is in effect quasi-criminal in nature."  *Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 806 F.2d 291, 298 (1st Cir.1986).  "The mere assertion of a RICO claim consequently has an almost inevitable stigmatizing effect on those named as defendants." *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990).  This Court has previously quoted the Fifth Circuit's stern approach to sanctions in RICO cases:

> Given the resulting proliferation of civil RICO claims and the potential for frivolous suits in search of treble damages, **greater responsibility will be placed on the bar to inquire into the legal and factual bases of potential claims or defenses** *prior to bringing such suit* <u>*or risk sanctions for failing to do so*</u>.

*Burnette v. Godshall*, 828 F. Supp. 1439, 1448 (N.D. Cal. 1993) (*quoting Chapman & Cole v. ITEL Container Int'l B.V.*, 865 F.2d 676, 685 (5th Cir. 1989)) (emphasis added).  For these reasons, courts readily impose sanctions upon the filing of frivolous RICO actions.  *See Id.*; *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 660 (S.D.N.Y. 1996), *aff'd sub nom.*, 113 F.3d 1229 (2d Cir. 1997).  Courts throughout the country also readily impose sanctions when an attorney fails to conduct a reasonable prefiling investigation in RICO actions, or a RICO complaint consists of conclusory or otherwise improper allegations not well-grounded in fact.  *Id.  See also Fred A. Smith Lumber Co. v. Edidin*, 845 F.2d 750, 754 (7th Cir. 1988) (reversing district court's denial of sanctions because it was "apparent that [] counsel failed to do the requisite legal research, that it persisted in advancing the objectively unreasonable claims already discussed, and that it generally acted in bad faith by filing a complaint for fraud in the hope that future discovery might uncover the allegations of wrongdoing"); *Segarra v. Messina*, 153 F.R.D. 22, 30 (N.D.N.Y.), *on reconsideration*, 158 F.R.D. 230 (N.D.N.Y. 1994) (imposing sanctions and stating "it is clear from the complaint filed that had the plaintiff conducted even a cursory investigation into the laws of RICO prior to filing his complaint, he would have had ample opportunity to realize the inadequacy of his pleading."); *Davis v. Hudgins*, 896 F. Supp. 561, 573 (E.D. Va. 1995), *aff'd*, 87 F.3d 1308

(4th Cir. 1996) (imposing sanctions because, *inter alia*, the complaint violated the requirement that a complaint be well-grounded in fact, as the plaintiff's allegations did not support any "pattern of racketeering activity" or the existence of an "enterprise").

**D.   JURISDICTION**

It is well established that, despite Plaintiff's voluntary dismissal without prejudice, this Court retains jurisdiction over all collateral matters, including the imposition of monetary sanctions pursuant to Section 1927 or the Court's inherent power.  *See Commercial Space Mgmt. Co. v. Boeing Co.*, 193 F.3d 1074, 1079 n.8 (9th Cir. 1999) ("a voluntary dismissal under Rule 41(a)(1)(i) does not divest the district court of jurisdiction to impose sanctions") (*citing Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393-98 (1990)); *Fallbrook Union High Sch. Dist. v. Christopher S.*, No. 08CV49-LAB (CAB), 2008 WL 595849, at *2 (S.D. Cal. Feb. 29, 2008) (voluntary dismissal does not deprive the Court of jurisdiction to consider sanctions under Section 1927 or its inherent power); *Impactoffice LLC v. Hard*, No. CV DKC 16-1675, 2016 WL 6600547, at *1 n.1 (D. Md. Nov. 8, 2016) (stating the court retained jurisdiction to resolve Section 1927 and inherent power sanctions despite Fed. R. Civ. Proc. 41(a)(1)(A)(i) voluntary dismissal without prejudice).

### III.   <u>PROCEDURAL HISTORY</u>

Plaintiff filed its Original Complaint (Dkt. No. 1) on November 19, 2015.  During December, Counsel for Certain Defendants was retained by BWE, Shemali, Myers, and Hi-Time. In early February, counsel for Certain Defendants was retained by the Rodriguezes and Sandi's, which at that time were in default.  Declaration of John R. Foote In Support Of Motion for Attorney's Fees ("ISO Motion") ("Foote Decl."), ¶ 2.  Counsel then requested that Mr. Ryan agree to set aside the default and dismiss the Rodriguezes and Sandi's from the case because they had nothing to do with the wine stolen from HPD, other than that their address was used to ship some of that wine to the owner of the building in which Sandi's leases the street-front portion.  Foote Decl., ¶ 2, Ex. 1.  While Mr. Ryan agreed to set aside the default and appeared to recognize that they should be dismissed, he refused to dismiss them unless they first identified their landlord and stated that they had no relationships with him or any of the other Defendants.  Foote Decl., ¶ 3.  On February 18, counsel for Certain Defendants provided Mr. Ryan with a proposed declaration by

Eduardo Rodriguez in which he would identify his landlord and state that he and his wife and Sandi's had no relationship with their landlord other than as landlord and tenant, and that they had no relationship with any of the other Defendants, but only if Mr. Ryan would first commit to dismiss them upon receipt of the signed declaration.  Foote Decl., ¶ 3, Ex. 2.  Mr. Ryan refused to make the requested commitment, in essence holding the Rodriguezes and Sandi's hostage unless they first identified their landlord without any commitment from Mr. Ryan.  Foote Decl., ¶ 4.

On February 25, 2016, Certain Defendants filed their Motion to Dismiss the Original Complaint (Dkt. No. 89) ("MTD Original Complaint").  Later that same day, Mr. Ryan requested that Certain Defendants withdraw their MTD Original Complaint, as he "imagine[d]" that an amended complaint "would address some of [Certain Defendants'] concerns and perhaps even pair down some of the [Certain Defendants]."  Foote Decl., ¶ 5, Ex. 3.  Counsel for Certain Defendants refused to withdraw the MTD Original Complaint unless and until HPD filed a first amended complaint.  Ultimately, Mr. Ryan did not oppose the MTD Original Complaint; instead, on March 17, 2016, he filed the FAC (Dkt. No. 96). [1] *Id.*  On April 4, 2016, Certain Defendants filed their Motion to Dismiss the FAC (Dkt. No. 102) ("MTD FAC").  On April 25, 2016, Plaintiff filed its Opposition to MTD FAC (Dkt. No. 109) ("MTD FAC Opposition").

On May 2, 2016, counsel for Certain Defendants sent a letter to Mr. Ryan, explaining why the FAC and the MTD FAC Opposition were meritless and in violation of Rule 11.  Foote Decl., ¶ 6, Ex. 4.  Among other things, the letter reminded Mr. Ryan of the extensive communications between HPD and Shemali shortly after the wine was stolen from HPD.  Counsel for Certain Defendants requested that Mr. Ryan withdraw the FAC and the MTD FAC Opposition, and warned Mr. Ryan that he would face a Rule 11 motion should he refuse to do so.  *Id.*  Mr. Ryan refused to withdraw the FAC and the Opposition.  On May 5, 2016, Certain Defendants filed their Reply in support of their MTD FAC (Dkt. No. 111) ("Reply ISO MTD FAC").

---

[1]     As his Sixth Claim for Relief alleged in the Original Complaint, Mr. Ryan had claimed that Certain Defendants were liable to Plaintiff for the crime of embezzlement, despite the fact that "there is no civil cause of action for embezzlement."  *See* MTD Original Complaint at 21 (*citing Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1257 (N.D. Cal. 2014)).  Mr. Ryan apparently realized from the MTD Original Complaint that his claim for embezzlement was legally baseless because he dropped it when he filed the FAC.

CERTAIN DEFENDANTS' MOTION FOR ATTORNEY'S FEES

Case No. 3:15-cv-5309 EMC

On September 22, 2016, the Court heard Certain Defendants' MTD FAC.  At the hearing, the Court explained to Mr. Ryan that the FAC was deficient in almost every requirement for pleading a RICO violation.  The next day, on September 23, 2016, the Court issued an order dismissing the FAC based on a "nonexhaustive" litany of the FAC's shortcomings but granted Plaintiff leave to amend.  *See* 9/23/16 Civil Minutes (Dkt. No. 134).  Pursuant to the Court's order, Plaintiff's SAC was due on October 14, 2016, Defendants' motions to dismiss the SAC were due on November 10, 2016, Plaintiff's opposition was due on November 25, 2016, Defendants' replies were due on December 2, 2016, and the hearing for Defendants' motions to dismiss was scheduled for December 15, 2016.  *Id.* [2]

On October 14, 2016, Plaintiff filed its SAC (Dkt. No. 135).  On November 10, 2016, Certain Defendants filed their Motion to Dismiss the SAC (Dkt. No. 138) ("MTD SAC").  On November 18, 2016, counsel for Certain Defendants served on Mr. Ryan by U.S. Mail a Rule 11 motion seeking monetary sanctions in the form of attorney's fees, as well as a Memorandum of Points and Authorities in support thereof and supporting declarations from Shemali, Myers, and John Khouri of BWE ("Rule 11 Motion").  Foote Decl., ¶ 7.  Pursuant to Rule 11's safe harbor provision, Certain Defendants' Rule 11 Motion notified Mr. Ryan that he had 21 days to withdraw his SAC and dismiss all of the Certain Defendants from this action or Certain Defendants would file the motion.  *Id.* [3]  On November 28, 2016, the day that Mr. Ryan's opposition to the MTD SAC was due, he filed a "Request and Order for Dismissal without Prejudice," unilaterally and voluntarily dismissing the action in its entirety against all Defendants.  (Dkt. No. 150).  On November 29, 2016, the Court issued an order dismissing the case.  (Dkt. No. 151).

## IV.   ARGUMENT

HPD and its counsel have pursued this action despite their recognition shortly after the wine

---

[2]     Mr. Ryan made a last minute request to extend the filing deadline for his oppositions to Defendants' MTD SAC from November 25 to November 28, due to the Thanksgiving holiday.  Counsel for Defendants granted his request and a stipulation was filed (Dkt. No. 143).  The hearing date was later continued to January 12, 2017, by a separate stipulation filed on November 22.

[3]     On November 23, 2016, counsel for Certain Defendants served on Mr. Ryan by U.S. Mail and E-mail two additional declarations by Eduardo Rodriguez and Diana Hirst of Hi-Time in support of its Rule 11 Motion, as well as a revised Rule 11 Motion with the Memorandum of Points and Authorities in support thereof.  Foote Decl., ¶ 8, Ex. 5 ("Revised Rule 11 Motion").

was stolen that Shemali was not trafficking in stolen goods.  The Original Complaint, the FAC, and the SAC were all clearly frivolous, as each was legally and factually baseless.  Moreover, Mr. Ryan has unreasonably and vexatiously multiplied the proceedings by refusing to dismiss the case and instead repeatedly misrepresenting the law and the facts.  Indeed, the pursuit of this action and Mr. Ryan's willingness to ignore the law and the facts demonstrate an improper purpose of attempting to "shake down" the Certain Defendants to extract nuisance settlements from them.  Such bad faith clearly should be punished with monetary sanctions.

## A.       PLAINTIFF'S COMPLAINTS ARE FACTUALLY BASELESS

The true facts regarding Certain Defendant Shemali's purchase of the Plaintiff's wine from Defendant Borges, resale to Certain Defendants BWE and Myers, and discovery that the wine had been stolen all demonstrate that the Certain Defendants did not knowingly participate in any wine theft ring.  Moreover, these facts reveal that HPD and Mr. Ryan's law firm, MMWBR, were well aware that neither Shemali nor any of the other Certain Defendants were part of any wine theft ring within weeks after the theft of wine from the HPD warehouse was discovered, as confirmed by HPD's agreements with Shemali and BWE.

### 1.       Shemali's Unknowing Purchase and Resale of Plaintiff's Wine

Certain Defendant Shemali conducts business as a wine broker in his own name and through his two entities, Certain Defendants WOW and Tri Cities.  Declaration of Michael Shemali ISO Motion ("Shemali Decl."), ¶ 2.  In early 2014, Shemali was advertising WOW on eBay as a buyer of wines, including from private collectors.  Shemali Decl., ¶ 3.

On February 3, 2014, Shemali received an E-Mail through eBay from Defendant David Borges, inquiring whether WOW would be interested in buying certain wines from him.  Shemali Decl., ¶ 3.  Prior to that E-Mail, Shemali had never bought any wine from Borges, had never had any communications with Borges, and had never even heard of Borges.  *Id.*  Shemali learned from Borges that he had been an executive at Bank of America and was trying to establish himself as a wine broker, and that his wife was a commercial real estate broker.  *Id.*  Shemali confirmed by internet search that Borges had been a Senior Vice President at Bank of America and lived in a very nice neighborhood.  *Id.*  Borges appeared to Shemali to be very professional, and Shemali had

1   no reason to doubt that Borges was a legitimate wine broker.  *Id.*

2       Over the course of the next month, Shemali purchased a total of $184,905.80 of wine from

3   Borges.  Shemali Decl., ¶ 4.  During this time, Shemali neither knew, nor suspected, nor had any

4   reason to suspect that the wines Borges had been selling to him had been stolen because Borges

5   claimed to have a very good connection with a distributor in Napa County, there was nothing

6   unusual about the vintages, which were all 2006 to 2010, and the prices Borges offered were in line

7   with the normal wholesale discounts that Shemali received from many of his distributors.  *Id.*

8       During the next few weeks, Shemali, through his entity WOW, resold some of the wine that

9   he had purchased from Borges to Certain Defendants BWE and Myers.  Shemali Decl., ¶ 4;

10  Declaration of John Khouri ISO Motion ("Khouri Decl."), ¶ 4; Declaration of Matt Myers ISO

11  Motion ("Myers Decl."), ¶ 4.  Neither Myers nor John Khouri of BWE thought there was anything

12  unusual about the quantities, vintages or prices of the wines that WOW was offering to sell to

13  BWE and Myers.  Khouri Decl., ¶ 4; Myers Decl., ¶ 4.  Certainly, neither had any idea that the

14  wine had been stolen.  Khouri Decl., ¶¶ 4 & 5; Myers Decl., ¶¶ 4 & 7. [4]

15      On or about March 17, 2014, Shemali received a telephone call from Brad Chambers, a

16  detective with the Napa County Sheriff's office, during which Detective Chambers informed

17  Shemali that the wine he had purchased from Borges had been stolen from a warehouse in Napa

18  County.  Shemali Decl., ¶ 5.  On or about that same day, Shemali called Myers and John Khouri of

19  BWE and told them that the wine WOW had sold to them during the prior few weeks had been

20  stolen.  Shemali Decl., ¶ 5; Khouri Decl., ¶ 5; Myers Decl., ¶ 7.  Shemali also asked Myers and

21  John Khouri of BWE to agree to return any of the wine still remaining in their possession, and

22  Myers and Khouri of BWE both agreed to do so.  *Id.*  Shemali also conveyed to both of them that

23  he would reimburse the amount they had paid to WOW for any wine he had purchased from

24  Borges and resold to them.  *Id.*  Shemali subsequently reimbursed both Myers and BWE for the

25  cost of the wine.  Shemali Decl., ¶ 6; Khouri Decl., ¶ 5; Myers Decl., ¶ 7.  And Shemali, Myers,

26

27  [4]    Shemali never sold or shipped any wine he had purchased from Borges to Certain Defendant Hi-Time.
    Shemali Decl., ¶ 4; Declaration of Diana Hirst ISO Motion ("Hirst Decl."), ¶ 3.  HPD also never contacted Hi-Time to
28  inquire about whether Hi-Time had purchased or was in possession of any wine stolen from its warehouse, nor did
    HPD ever make any attempt to recover any of its stolen wine from Hi-Time.  Hirst Decl., ¶ 4.

and BWE returned to HPD all of the wine that they had in their possession.  Shemali Decl., Exhs.
A & B; Khouri Decl., ¶¶ 5-7, Ex. A; Myers Decl., ¶ 9.

### 2.    Discussions and Agreements Between Shemali and Plaintiff

Within a week after having learned that the wine he had purchased from Borges had been
stolen, Shemali was contacted by Peter Stravinski, who represented to Shemali that he was the
President of HPD, the owner of the warehouse from which the wine had been stolen, and that he
was attempting to recover the stolen wine.  Shemali Decl., ¶ 6.  On March 26, 2014, during a
lengthy telephone call, Shemali told Stravinski about his purchases of wine from Borges, and
Stravinski proposed an oral agreement that Shemali accepted.  *Id.*  The terms of their oral
agreement were memorialized in an E-Mail that Stravinski sent to both Shemali and Detective
Chambers.  Shemali Decl., ¶ 6 and Ex. A.  Shemali agreed to return all of the wine still in his
possession to HPD's warehouse, and immediately inform Myers and BWE that they were in
possession of stolen property and should return the wine to HPD's warehouse. [5]  Shemali Decl.,
Ex. A.  Shemali also agreed to provide "a complete list of all of the wines" Shemali, WOW, and
Tri Cities had bought from Borges, and "copies of all of the checks" that Shemali had issued to
Borges to purchase the wine referenced on the list.  Shemali Decl., Ex. A at ¶¶ (a) and (c).
Additionally, both Shemali and Stravinski agreed to each submit a claim for their losses to their
respective insurance companies.  Shemali Decl., Ex. A at ¶ (g).  Finally, "in recognition of
[Shemali's] efforts," Stravinski agreed to help Shemali financially until Shemali could recover the
money he had paid to Borges for the wine.  Shemali Decl., Ex. A at ¶ (l).  As stated by Stravinski
in his E-Mail, these actions by Plaintiff and Shemali would "**completely demonstrate that <u>none
of us knowingly traffics in stolen property</u>**."  Shemali Decl., Ex. A at ¶ (f).

**On April 4, 2014, Shemali met in Washington with Stravinski and HPD's lawyer, Carl
Motschiedler, *<u>who is a partner in Mr. Ryan's law firm</u>*.** [6]  Shemali Decl., ¶ 7.  At the meeting,
Shemali told Stravinski and Motschiedler everything he knew about Borges and his purchases of

---

[5]    Shemali had already informed Myers and BWE that the wine had been stolen and should be returned to
Plaintiff's warehouse, and this was recognized in the E-mail by the language "immediately inform, or **have already
informed** …"  Shemali Decl., Ex. A at ¶ (f).

[6]    Mr. Ryan and Mr. Motschiedler are both named partners of the same law firm, Motschiedler, Michaelides,
Wishon, Brewer & Ryan, LLP.  *See* http://www.mmwbr.com/index.

1   wine from him, as well as about BWE and Myers and his sales to them of the wine he had

2   purchased from Borges.  *Id.*  Also at that meeting, Stravinski and Motschiedler presented Shemali

3   with a written agreement which Shemali and Stravinski both signed.  Shemali Decl., ¶ 7 and Ex. B.

4   Among other things, Shemali provided all of the checks he had written to Borges, which were to be

5   attached as exhibits, and agreed to provide assistance to HPD in recovering its wines.  Shemali

6   Decl., Ex. B at ¶¶ 3, 4, 10, and 13.  In return, Stravinski agreed that HPD would arrange a loan to

7   Shemali of up to $132,000 that he could use to reimburse BWE and Myers for the wines they had

8   bought from him.  Shemali Decl., Ex. B at ¶ 12.

9           **3.**      **Discussions and Agreement Between BWE and Plaintiff**

10          In late March of 2014, a representative of HPD, Bill Harper, contacted John Khouri of

11  BWE to arrange a time when Plaintiff could send a truck to pick up its stolen wine and, on March

12  27, 2014, Plaintiff picked up the wine.  Khouri Decl., ¶ 6.  On or about that same day, Mr. Harper

13  asked BWE to sign an agreement concerning the wine, and BWE signed the agreement.  Khouri

14  Decl., ¶ 7, Ex. A ("BWE Agreement").  Among other things, BWE agreed to return all of the wine

15  in its possession, and BWE did so on or about March 27, 2014.  *Id.*  Significantly, the BWE

16  Agreement also provides that "[BWE] assure[d] [Plaintiff] that it purchased the wine in what

17  **[BWE] believed to be a lawful, commercial transaction**."  *See* Khouri, Decl., Ex. A at ¶¶ 2-4.

18  Although BWE signed the BWE Agreement and returned it to Mr. Harper, BWE never received a

19  copy of the agreement signed by HPD.  Khouri Decl., ¶ 7.  BWE returned to HPD all of the wine it

20  had purchased from Shemali with the exception of two bottles which it no longer had.  *Id.* at ¶ 8.

21          **4.**      **Mr. Ryan's "Factual" Allegations Are Frivolous**

22          Mr. Ryan made countless reckless and frivolous "factual" allegations throughout his

23  Original Complaint, FAC, and SAC.  His complaints were littered with conclusory, speculative,

24  and/or implausible assertions utterly lacking any evidentiary support.  Additionally, nothing in any

25  of Mr. Ryan's complaints can explain why he continuously and repeatedly alleged "facts" in direct

26  contradiction to the facts that ***Mr. Ryan's law partner*** and **Plaintiff's President** had learned from

27  their discussions with Shemali and had confirmed in their agreements with him in March and April

28  of 2014.  The same is true for the allegations that directly contradict the agreement between

Plaintiff and BWE.  And, of course, given the above facts showing Shemali's and BWE's complete innocence, as well as the recognition of it by HPD and Mr. Ryan's law partner, there is no possible way that Mr. Ryan could have asserted in good faith that any of the other Certain Defendants could have been participants in a "wine theft ring" or be guilty of trafficking in stolen wine.  Set forth below is a nonexhaustive list of frivolous "factual" allegations that Mr. Ryan recklessly made, all or some of which Mr. Ryan must have known were frivolous and/or outright false.

### a.    Original Complaint, FAC and SAC

All of the complaints allege that each of the Certain Defendants was part of a "wine theft ring" with Defendants Pina, Whitefield, and Borges, and that this wine theft ring had been operating long before Shemali first heard of Borges.  There is no basis for Mr. Ryan to have alleged that any of the Certain Defendants were knowing participants in a wine theft ring, and especially one that had been operating for several years prior to the theft of Plaintiff's wine.  First, Shemali knew from his conversations with Stravinski and Motschiedler that neither of them believed this to be the case or even had any reason to suspect it was the case.  Shemali Decl., ¶ 11(a).  The same can also be said about Khouri of BWE and Myers' conversations with representatives of Plaintiff.  *See* Khouri Decl., ¶¶ 7-8; Myers Decl., ¶ 10.  Second, if Stravinski and Motschiedler had believed this to be the case, then they certainly would not have agreed to arrange a loan to help Shemali reimburse BWE and Myers. [7]

It is also wholly improper for Mr. Ryan to have alleged in the Original Complaint, FAC, and SAC that Shemali knew or should have known that the wine WOW had purchased from Borges was stolen when, on or about March 26, 2014, **Plaintiff had already _agreed_ that Shemali did not "knowingly traffic in stolen property."**  *See* Shemali Decl., Ex. A at ¶ (f).  Mr. Ryan's similar allegation that BWE and Myers knew or should have known the wine was stolen contradicts the agreement drafted by Plaintiff and signed by BWE, which explicitly states that BWE believed that its wine purchase from WOW was a lawful, commercial transaction.  *See* Khouri Decl., Ex. A at ¶¶ 2-4.  Moreover, Stravinski and Motschiedler would not have agreed to

---

[7]    Mr. Ryan also had no basis to allege that Hi-Time, the Rodriguezes or Sandi's were part of the purported wine theft ring.  *See* Declaration of Eduardo Rodriguez ISO Motion ("Rodriguez Decl."), ¶ 3-7; Hirst Decl., ¶¶ 3-6.

arrange a loan to Shemali so he could reimburse BWE and Myers if they believed that Shemali, BWE, and/or Myers knew or should have known the wine had been stolen. [8]

### b.    Paragraph 22(e) of SAC

Perhaps the most outlandishly false allegation in the SAC, or any of the complaints, was made in paragraph 22(e) of the SAC, in which Plaintiff claimed that, in early 2015, it "discovered" a large quantity of Insignia wine for sale on the web site of WOW or Tri Cities, "discovered" that the Insignia wine had been stolen from a warehouse owned by Biagi Brothers, and "believes" that the Insignia wine was stolen from that warehouse by Defendants Pina, Whitefield and Borges and conveyed by Borges to Shemali.  Shemali never bought any Insignia wine from Borges during 2015, and Mr. Ryan has absolutely no basis on which to speculate that he did so, especially when Shemali had numerous conversations with Stravinski about suing Borges to recover the loss Shemali had suffered from his 2014 wine purchases and, in fact, did sue Borges on March 31, 2015.  Shemali Decl., ¶ 11(g).  This outlandish allegation also defies all reason and logic, as there is absolutely no way Shemali would have bought more wine from Borges in 2015, when he already had lost $184,905.80 by buying wine from him in 2014.

### c.    Paragraph 22(h) of SAC

It was also wholly improper for Mr. Ryan to have alleged in paragraph 22(h) of the SAC—in conclusory fashion with absolutely no supporting facts—that "Shemali and his entities, WOW and Tri-Cities, obtained from Borges significantly more wine stolen from Plaintiff than what is reflected in the checks included in Exhibit A."  First, Shemali is convinced based on his conversations with Stravinski and Motschiedler that they both know that this allegation is blatantly false.  Shemali Decl., ¶ 11(d).  Second, Mr. Ryan had absolutely no basis to make such an allegation, given that Shemali had extensive discussions with Stravinski regarding how to recover Shemali's $184,905.80 from Borges, during which Shemali never once even hinted to Stravinski that he had paid more than that amount to Borges.  *Id.*  Third, this allegation ***directly contradicts*** the express language of the agreements between Plaintiff and Shemali, in which Shemali agreed

---

[8]    Because Mr. Ryan has no evidentiary basis to allege that any of the Certain Defendants knew that the wine they had purchased and/or received was stolen, Mr. Ryan's fifth claim for relief that Certain Defendants entered into a conspiracy to commit conversion is also frivolous, as is his sixth claim for receiving stolen property.

that he had: (1) provided to Plaintiff a list of all of the wine WOW had purchased from Borges; (2) provided to Plaintiff all of the checks WOW had issued to Borges for that wine; and (3) represented to Plaintiff that those checks constituted payment in full for the total amount WOW had agreed to pay to Borges for that wine.  Shemali Decl., Exhs. A & B.

### d.    Paragraph 22(i) of SAC

Although the SAC accurately alleged in paragraph 22(i) that Stravinski met with Shemali in person in Washington, Mr. Ryan failed to disclose that this meeting took place on April 4, 2014, only a few weeks after Shemali had learned the wine was stolen, and that Motschiedler also attended that meeting.  Even worse, Mr. Ryan had absolutely no basis to allege in that same paragraph that "**[a]fter initial denials**, Shemali admitted that had [sic] purchased the stolen wine in question and had acquired it from defendant Borges."  There were no "initial denials" at this meeting, and Motschiedler and Stravinski know this is demonstrably false because on March 26, 2014, roughly one week prior to this meeting, Shemali had already entered into the memorialized oral agreement with Stravinski, in which Shemali had acknowledged that he had purchased HPD's wine from Borges and had subsequently learned that the wine had been stolen from Plaintiff's warehouse.  Shemali Decl., ¶ 11(e) and Ex. A.

Paragraph 22(i) of the SAC also alleges that Shemali made it clear during the April 4 meeting that he had a close personal and business relationship with Borges.  Mr. Ryan has absolutely no basis for making this false allegation.  Shemali never said such a thing to Stravinski during the April 4 meeting or at any other time.  Shemali Decl., ¶ 11(f).  Shemali had only known Borges for two months at the time of the meeting, and only by means of E-Mails, text messages, and an occasional telephone call.  Shemali Decl., ¶¶ 3, 11(f).  Shemali had never even met Borges in person and certainly did not have a close personal relationship with him.  *Id.*

### e.    Paragraph 22(p) of the SAC

In paragraph 22(p) of the SAC, Mr. Ryan alleged that Myers told Stravinski that he would have a difficult time proving that Myers ever had possession of the wine because the shipping labels were made out to Sandi's.  Mr. Ryan had absolutely no basis for making this completely false allegation, as Myers said no such thing to Mr. Stravinski.  Myers Decl., ¶ 8.  Indeed, it makes

4832-7220-2045

1    no sense for Mr. Ryan to allege that Myers said this because Mr. Ryan alleges that some of the

2    wine Myers bought from Shemali was shipped directly to Myers in Arizona.

3        In that same paragraph, Mr. Ryan alleges that Myers told Stravinski that he "travelled

4    weekly to Sandi's Pet Place from [Myers'] home in Glendale, Arizona and either brought [the wine

5    that had been delivered there] back with him to California or placed it in a storage locker at Hi-

6    Time." Once again, Mr. Ryan had absolutely no basis for making this completely false allegation,

7    as Myers said no such thing to Stravinski. Myers Decl., ¶ 8. Additionally, it would have been

8    nonsensical for Myers to say that he traveled from Arizona to California to bring the wine back to

9    California. *Id.* Finally, Myers never put any of the wine he had bought from WOW during

10   February and March of 2014 into a storage locker at Hi-Time. Myers Decl., ¶ 8; Hirst Decl., ¶ 3.

11   Mr. Ryan simply has no evidentiary basis for these allegations.

12                **f.      Paragraphs 22(p) and (r) of the SAC**

13        Paragraphs 22(p) and 22(r) of the SAC alleged that Sandi's and the Rodriguezes were

14   acting as Myers' "'fence' … in a failed attempt to conceal Myers' involvement in the wine theft

15   ring" and that the Rodriguezes and Sandi's "held [the wine] for Myers, delivered it to Myers, and

16   were thereafter compensated on numerous occasions … for their receipt, holding, storage and

17   delivery of the stolen wine." First and foremost, no form of compensation has ever been

18   exchanged between Myers and the Rodriguezes or Sandi's, period. Myers Decl., ¶ 6; Rodriguez

19   Decl., ¶ 6. Second, the Rodriguezes and Myers have never had communications, nor were

20   directions ever exchanged between the two of them to hold, deliver, or store the wine. *Id.* Finally,

21   this allegation that Sandi's acted as a "fence" is pure fiction. In fact, the only reason that wine was

22   shipped to Sandi's address is that it occupies the entire portion of the building facing the street so it

23   is often used when articles are shipped to their landlord's small storage warehouse located in the

24   back of the building. *See* Myers Decl., ¶ 5; Rodriguez Decl., ¶¶ 3-4.

25                **g.      Paragraph 21(b) of FAC**

26        While both the SAC and FAC share many frivolous allegations, the FAC has frivolous

27   allegations unique to only it. In paragraph 21(b) of the FAC, Mr. Ryan alleged that some of the

28   wines stolen from HPD still remained for sale by WOW, Tri Cities, and/or BWE at the time of the

filing of the FAC.  Mr. Ryan made this allegation despite the fact that Stravinski and Motschiedler were satisfied that all of the wine that had been in the possession of these Certain Defendants had been returned to HPD in early 2014.  Indeed, the frivolous nature of this allegation is demonstrated by the fact that it was dropped completely when Mr. Ryan filed his SAC.

### h.   Paragraph 21(d) of FAC

The FAC alleged in paragraph 21(d) that Shemali was involved in organizing the thefts from HPD's warehouse by working with Borges "to determine the types and amounts of wine to steal from Plaintiff's facility."  Mr. Ryan had absolutely no basis for making this ludicrous allegation of pre-theft planning by Shemali and Myers.  Indeed, Shemali knows from his conversations with Stravinski and Motschiedler that neither of them believed this to be true or even had any reason to suspect it was true.  Shemali Decl., ¶ 11(b).  Additionally, as explained above, had either of them believed it to be true, then they certainly would not have agreed to arrange a loan to help Shemali reimburse BWE and Myers.  Once again, this frivolous allegation was dropped when Mr. Ryan filed his SAC.

### 5.   Mr. Ryan's Flip-Flopping Allegations

Further demonstrating not only the baseless, misleading, and knowingly false nature of Mr. Ryan's allegations, but also his complete failure to conduct a reasonable and competent inquiry before filing the complaints, is the numerous times Mr. Ryan has flip-flopped with respect to his factual allegations throughout the complaints:

- *RICO Enterprise* – The Original Complaint alleged that a RICO enterprise existed "to steal wine from **Plaintiff's wine storage facility**…"  *See* Compl., ¶ 30.  The FAC alleged that a RICO enterprise existed "to steal wine from **storage facilities in Napa County**, California, including Plaintiff's facility…"  *See* FAC., ¶ 21(a).  The SAC alleged that a RICO enterprise existed "to steal wine from storage facilities in Napa County, California, including Plaintiff's facility and a **facility operated by the Biagi Brothers**…"  *See* SAC, ¶ 22(a).

- *Pre-Theft Planning* – The Original Complaint contained absolutely no facts even remotely suggesting that any of Certain Defendants had ever had any communications

17

with Borges, Whitefield, or Pina—or was even aware of their existence—prior to the thefts from Plaintiff's warehouse.  Nonetheless, the FAC alleged that Shemali and Myers engaged in **pre-theft planning** with Borges, Whitefield and Pina: "[the wine theft ring] was first organized … with Borges working with Shemali and the entities he controlled (defendants WOW and Tri-Cities), Pina, Whitefield and Myers to determine the types and amounts of wine to steal from Plaintiff's facility."  FAC, ¶ 21(d).  The SAC **completely dropped this false and baseless allegation of any type of pre-theft planning** by Shemali and Myers and, once again, contained no facts plausibly suggesting that any of the Certain Defendants had ever had any communications with Borges, Whitefield, or Pina prior to the thefts from Plaintiff's warehouse.

- *Time Period When Thefts Occurred at Plaintiff's Facility* – Mr. Ryan alleged more than once in the FAC that wine was stolen from Plaintiff's facility "**over a period of several months**."  *See*, *e.g.*, FAC, ¶¶ 19, 21(e).  However, in the SAC, Mr. Ryan alleged that the thefts from Plaintiff's warehouse occurred **throughout 2013 and 2014**.  *See* SAC, ¶ 22(b) & (f).

- *Beginning of Alleged Crime-Ring* – In the FAC, Mr. Ryan alleged at times that the enterprise existed "[f]or at least three years preceding the filing of this complaint," and at other times "for at least one year—but believed to be a number of years prior thereto."  FAC, ¶¶ 21(a), 24, and 32.  However, Mr. Ryan claimed in his MTD FAC Opposition that: "The First Amended Complaint alleges that the crime-ring **began in 2014** and was ongoing in March of 2016 …."  Opp. MTD FAC at 13:27 – 14:2.  Mr. Ryan alleged in the SAC that the enterprise "**beg[an] in early 2013** and continu[ed] through at least 2015."  SAC, ¶ 22(a).

- *Plaintiff's Stolen Wine Being Sold on Defendants' Websites* – Mr. Ryan alleged in the FAC that Plaintiff's stolen wines remained for sale on the websites of one or more of the Certain Defendants at the time of the filing of the FAC.  *See* FAC (Dkt. No. 96), ¶ 21(b) & (k).  Mr. Ryan dropped this completely false allegation in the SAC.

1      •    *Biagi Brothers* – Despite Plaintiff allegedly learning of the purported wine theft from

2          the Biagi Brothers warehouse in early 2015 (*see* SAC, ¶ 22(e)), there is not one word

3          about it in Plaintiff's Original Complaint, filed in November of that year, or in the FAC,

4          filed in March of 2016.

5   **B.**    **PLAINTIFF'S COMPLAINTS ARE LEGALLY BASELESS**

6      **1.**    **Mr. Ryan Disregards RICO Law**

7      Thrice now, Mr. Ryan has submitted complaints wholly ignoring the well-established and

8   easily accessible pleading requirements for alleging a RICO violation under Sections 1962(b), (c),

9   or (d), but his Original Complaint was arguably the worst.  Based on the skeletal, conclusory, and

10   wholly frivolous allegations related to his civil RICO claims, not to mention his civil

11   embezzlement claim that simply does not exist, Mr. Ryan obviously failed to do his homework and

12   chose to "file first and investigate later," which is simply unacceptable.  *See Burnette*, *supra*, 828

13   F. Supp. at 1448.  The Original Complaint reveals on its face the frivolousness of that filing and the

14   impossibility of its success.  For example, while the FAC and SAC each cited three baseless acts of

15   racketeering activity, the Original Complaint cited ***18 acts of racketeering activity***, 16 of which

16   had no relationship ***whatsoever*** to the facts alleged. [9]  Indeed, the total lack of substance in Mr.

17   Ryan's RICO claims, as well as the "egregious and unjustified neglect of the required statutory

18   elements," gives rise to the inference that the Original Complaint was filed for improper purposes.

19   *See Katzman*, *supra*, 167 F.R.D. at 661.  Whether deliberate or the result of extraordinarily shoddy

20   research, filing the Original Complaint was both reckless and frivolous, and tantamount to bad

21   faith, warranting attorney's fees under this Court's inherent power.  *Id.*

22      Upon Certain Defendants filing their MTD the Original Complaint, Mr. Ryan was provided

23   with a virtual outline—complete with an index of Ninth Circuit cases, easily accessible to

24

25   [9]      The 18 acts of racketeering activity cited by Mr. Ryan in his Original Complaint are the following:  18 U.S.C.
§ 2319 (relating to criminal infringement of a copyright); 18 U.S.C. § 2320 (relating to trafficking in goods or services

26   bearing counterfeit marks); 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant); 18 U.S.C.
§ 1513 (relating to retaliating against a witness, victim, or an informant); 18 U.S.C. § 2315 (relating to interstate

27   transportation of stolen property); 18 U.S.C. § 1503 (relating to obstruction of justice); 18 U.S.C. § 1510 (relating to
obstruction of criminal investigations);  18 U.S.C. § 1511 (relating to the obstruction of State or local law

28   enforcement); 18 U.S.C. §§ 1581–1588 (relating to peonage, slavery, and trafficking in persons); 18 U.S.C. § 1341
(relating to mail fraud), and 18 U.S.C. § 1344 (relating to bank fraud).  Original Compl., ¶¶ 3 and 4.

attorneys—of the pleading requirements for each of the elements of Plaintiff's RICO claims and how the Original Complaint failed to meet those requirements.  Mr. Ryan undoubtedly knew at this point that his Original Complaint was legally baseless because, rather than choosing to oppose Certain Defendants' motion to dismiss it, Mr. Ryan requested that Certain Defendants withdraw the motion and stated that his "imagine[d] [FAC] would address some of [Certain Defendants'] concerns and perhaps even pair down some of the [Certain Defendants]."

Given Certain Defendants' MTD the Original Complaint, Mr. Ryan should never have continued this lawsuit.  Nonetheless, while Mr. Ryan dropped his ridiculous civil claim for embezzlement (*see* note 1, *supra*), his FAC neither 'paired down' any of the Certain Defendants nor addressed the absurdity of his allegations.  Indeed, he still frivolously alleged in the FAC that Certain Defendants violated RICO sections 1962(b), (c), and (d).  Mr. Ryan must have intentionally ignored the "outline" Certain Defendants had provided to him regarding how to adequately allege his RICO violations, since he proceeded to file an FAC that again failed to adequately allege essentially every substantive element of a RICO violation.

Mr. Ryan rebuffed the warning that Certain Defendants would file a Rule 11 motion for sanctions should he fail to voluntarily dismiss the FAC, which of course forced Certain Defendants to incur significant additional expenses in filing a reply and preparing for and appearing to orally argue the motion.  As pointed out in the MTD FAC, not once did Mr. Ryan plausibly suggest that any of the Certain Defendants "participated in the conduct or affairs of," or "acquired an interest in or control over," the purported RICO enterprise—let alone did so through a pattern of racketeering activity.  With respect to the "pattern" element, Mr. Ryan obviously could not establish open-ended continuity because all facts indicated that the purported enterprise had ceased activity.  Likewise, he could not establish closed-ended continuity because, according to the allegations in the FAC, the alleged racketeering activity by the Certain Defendants lasted only "several months," which is far too short a time period.  In addition, Mr. Ryan failed to adequately allege that any of the Certain Defendants were "associated" with an enterprise whose purported purpose was to steal and sell stolen wine, or that any of the Certain Defendants' purchase and/or receipt of the wine, rather than the theft, "caused" Plaintiff's injury.  As discussed below, Mr. Ryan also failed to adequately plead

any "predicate acts of racketeering activity" by any of the Certain Defendants.  Mr. Ryan failed to adequately allege not just one, but *every single* element of a RICO violation under Sections 1962(b), (c), and (d), and this Court essentially ruled as much when it dismissed the FAC.

Incredibly, despite all this Mr. Ryan chose to file an SAC that *suffered from the same fundamental flaws as his two prior complaints.*  As explained in Certain Defendants' MTD the SAC, *none* of the necessary elements for a violation of Sections 1962(b), (c), or (d) was adequately alleged for essentially the exact same reasons that they were not adequately alleged in the FAC. And just like the two prior complaints, and detailed above at pages 13-19, the SAC is littered with conclusory, speculative, equivocal, and false allegations.  Significantly, Mr. Ryan did absolutely nothing to correct his failure in the FAC to allege that any of the Certain Defendants gained an interest in or control over the enterprise, participated in the conduct of the affairs of the enterprise, or was associated with the enterprise, despite this Court specifically informing Mr. Ryan in its order dismissing the FAC that these elements, among others, were deficient.  Mr. Ryan obviously knew that the SAC was frivolous because, once he received Certain Defendants' Revised Rule 11 Motion, he immediately dismissed the SAC the following Monday.

Given that Mr. Ryan miserably failed to allege the elements necessary to establish a violation under Sections 1962(b), (c), and (d), which of course were handed to Mr. Ryan on a platter when Certain Defendants filed their motion to dismiss the Original Complaint, that he ignored this Court's order dismissing the FAC by failing to properly allege the elements of RICO in his SAC, and that he essentially admitted that his SAC was frivolous when he dismissed the action almost immediately after receiving Certain Defendants' Revised Rule 11 Motion, Mr. Ryan's filing of the FAC and SAC was tantamount to bad faith, and also constituted an unreasonable and vexatious multiplication of the proceedings, warranting sanctions under both Section 1927 and this Court's inherent power.

**2.**     **Mr. Ryan Disregards the Law Regarding Each Alleged Predicate Act**

Mr. Ryan also failed to make a reasonable and competent inquiry into the requirements for adequately pleading acts of racketeering activity under RICO and, in some circumstances, made reckless and/or knowing legal assertions designed to mislead this Court.

21

### a.     Interstate Transportation of Stolen Goods – 18 U.S.C. § 2315

Mr. Ryan's allegation of Interstate Transportation of Stolen Goods was deficient because he never plausibly alleged that any of the Certain Defendants actually knew the wine was stolen, as required by the statute.  In his MTD FAC Opposition, Mr. Ryan deceivingly quoted only part of the statute—"18 U.S.C. §2315 requires that a person 'receives, possesses, conceals, stores, barters, sells of [sic] disposes of goods … of the value of $5,000 or more … which have crossed a State or United States Boundary'"—and then argued that the FAC adequately plead a violation under that quoted language.  *See* MTD FAC Opposition at 14: 5-7.  Mr. Ryan's partial quote of the statute blatantly omitted the essential element of knowledge, as the statute continues on to state: "…crossed a State or United States Boundary after being stolen, unlawfully converted, or taken, ___***knowing the same to have been stolen, unlawfully converted, or taken***___." (Emphasis added). *Compare* 18 U.S.C. § 2315, *with* MTD FAC Opposition at 14: 5-7; *see also* Reply ISO MTD FAC at 11-12.  Mr. Ryan thus either deceptively represented the law, or completely disregarded the requirements of adequately pleading a violation of 18 U.S.C. § 2315.

### b.     Mail Fraud – 18 U.S.C. 1341

While citing mail fraud as a predicate act, Mr. Ryan simply failed to allege any type of fraud or attempted fraud by Certain Defendants, as required by the statute.  Additionally, in his MTD FAC Opposition, Mr. Ryan argued that "Rule 9(b) requires Plaintiff to only generally plead acknowledge and theft [sic], and Plaintiff does much more than that."  MTD FAC Opposition at 14: 18-19.  This is simply not true.  As pointed out in Certain Defendants' MTD FAC and again in their Reply, it is well established that a pleader alleging the RICO predicate act of Mail Fraud must "detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme." *See* MTD FAC at 20:13 – 21:18 (*citing Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991)).  Again, Mr. Ryan either deceptively represented the law, or completely failed to make a reasonable and competent inquiry into the requirements of adequately pleading a violation under the mail fraud statute. [10]

---

[10]     In his FAC, Mr. Ryan also cited to 18 U.S.C. § 1344 (bank fraud) as a predicate act of racketeering activity. *See* FAC, ¶ 4.  Despite conceding in his MTD FAC Opposition that he had not sufficiently alleged bank fraud, Mr. Ryan again cited to the bank fraud statute as a predicate act in the SAC without adding any allegations even remotely

1

## C.    ATTORNEY'S FEES

2    Reasonable hourly rates are to be calculated according to the prevailing market rates in the

3    forum of the district court. *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).

4    In determining a reasonable hourly rate, courts consider the fees charged by attorneys of

5    reasonably comparable skill, experience, and reputation, as well as the quality of counsel's services

6    on behalf of the client and the complexity of the work performed. *Id.*; *Fallay v. S.F. City & Cty.*,

7    No. C 08-2261 CRB, 2016 WL 879632, at *6 (N.D. Cal. Mar. 8, 2016) (*citing Penn. v. Del. Valley*

8    *Citizens Council*, 478 U.S. 546, 556-57 (1987)).  When considering the rates of other lawyers of

9    comparable skill, experience, and reputation, courts should look to the fees charged to paying

10    clients, as well as fees awarded, in "other types of equally complex federal litigation." *See*

11    *Bernardi v. Yeutter*, 951 F.2d 971, 974 (9th Cir. 1991); *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942,

12    946 (9th Cir. 2007).  Reasonable hourly rates multiplied by a reasonable number of hours provide

13    the "presumptively reasonable" amount of attorney's fees. *Apple, Inc. v. Samsung Electronics Co.*,

14    C 11–1846 LHK PSG, 2012 WL 5451411 (N.D. Cal. Nov. 7, 2012), (*citing Hensley v. Eckerhart*,

15    461 U.S. 424, 434 (1983)).  "Courts generally accept the reasonableness of hours supported by

16    declarations of counsel." *Rodriguez v. Cty. of L.A.*, 96 F. Supp. 3d 1012, 1024 (C.D. Cal. 2014).

17    Courts have utilized various tools and guidelines in assessing whether an attorney's

18    requested hourly rate is reasonable.  Affidavits from the "attorney and other attorneys regarding

19    prevailing fees in the community, and rate determinations in other cases … are satisfactory

20    evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896

21    F.2d 403, 407 (9th Cir. 1990).  "The amount billed by other law firms in the community, including

22    the yearly increase in other firms' fees, is an appropriate barometer of reasonable rates." *Gates v.*

23    *Rowland*, 39 F.3d 1439, 1451 (9th Cir. 1994).  The *Laffey* Matrix and the National Law Journal

24    Billing Survey 2014 have also been used to assess whether an attorney's rates are reasonable.  *See*

25    *Berry v. Urban Outfitters Wholesale, Inc.*, No. 13-CV-02628JSW (KAW), 2015 WL 580579, at *4

26    (N.D. Cal. Feb. 11, 2015) (citing to the Adjusted *Laffey* Matrix in determining reasonable hourly

27    rate); *Chambers v. Whirlpool Corp.*, No. CV111733FMOJCGX, 2016 WL 5922456, at *14 (C.D.

28

suggesting a violation of that statute.  *See* SAC, ¶ 4.

CERTAIN DEFENDANTS' MOTION FOR ATTORNEY'S FEES
Case No. 3:15-cv-5309 EMC

4832-7220-2045

Cal. Oct. 11, 2016) (using the National Law Journal's 2014 survey as a tool in finding hourly rates ranging from $485 to $750 per hour is reasonable).

Here, the $600 hourly rate actually billed to Certain Defendants for the services of partners John Foote and Gregory O'Hara clearly is reasonable.  Foote Decl., ¶¶ 9-15.  It is 21% less than Mr. Foote's 2016 standard rate, and 23% less than Mr. O'Hara's 2016 standard rate. [11]  *Id.*  The $400 hourly rate actually billed for associate Karl Sung and $300 hourly rate for senior litigation paralegal Lisa Phillips are also reasonable, and approximately 8% less than their standard rates in 2016.  *Id.*  These rates are comparable to other attorneys in the Bay Area with comparable skill and experience, and are in line with rates that have been found reasonable for Bay Area attorneys.  *See id.*; *see also Ruch v. AM Retail Grp., Inc.*, No. 14-CV-05352-MEJ, 2016 WL 5462451, at *11 (N.D. Cal. Sept. 28, 2016) (finding Bay Area hourly rate between $175 and $730—depending on the particular support staff, attorney, or partner—reasonable and "in line with the overall range of market rates in [the Northern District] for attorneys and for litigation support staff of similar abilities and experience"); *Gutierrez v. Wells Fargo Bank, N.A.*, 2015 WL 2438274, at *5 (N.D. Cal. May 21, 2015) (finding hourly rate between $475-$975 for partners and $300-$490 for associates reasonable rates for Bay Area attorneys); *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010) (holding that district court did not abuse its discretion in awarding 2008 hourly rates for Bay Area attorneys of up to $875 for a partner and $425 for an attorney with approximately five years of experience).  The price of legal services in the Bay Area are generally comparable to those in the Los Angeles metro area, where hourly rates exceeding the rates of Mr. Foote, Mr. O'Hara, and Mr. Sung's rates have been found reasonable.  *See*, *e.g.*, *Counts v. Meriwether*, 2016 WL 1165888, *3-4 (C.D. Cal. 2016) ($701.25, $552.50, and $446.25); *Rodriguez*, 96 F. Supp. 3d at 1023 (approving rates from $500 to $975).

The hourly rates of Mr. Foote, Mr. O'Hara and Mr. Sung are also in line with the Adjusted *Laffey* Matrix and the National Law Journal Billing Survey 2014, especially when taking into account inflation as well as the typically high price for legal services in the Bay Area.  According

---

[11]     Nixon Peabody LLP discounted its standard hourly rates because of the small size and limited financial resources of the Certain Defendants, as well as the frivolous nature of the lawsuit against them.  *See* Foote Decl., ¶ 12.

to the Adjusted *Laffey* Matrix, the unadjusted rate of an attorney with over 20 years of experience is listed as $826 per hour, and an attorney with 4 years of experience as $421 per hour. *See* Adjusted Laffey Matrix, *http://www.laffeymatrix.com/see.html* (last visited December 7, 2016). The National Law Journal Billing Survey, which purports to have rates for 159 of the 350 largest firms throughout the country, states that three years ago in 2013 partner billing rates averaged $604 per hour and associate billing rates averaged $371 per hour. *See* *http://www.nationallawjournal.com/id=1202636785489/Billing-Rates-Across-the-Country.*

The fees charged to Certain Defendants by Nixon Peabody for the entire defense of this action through November 23, 2016 total $279,070. Foote Decl., ¶¶ 14-15. The fees charged to Certain Defendants from March 1, 2016, after Certain Defendants had filed their MTD Original Complaint and Mr. Ryan had indicated his intention to file an amended complaint, through November 23, 2016, total $174,860. Thus, Certain Defendants request that the Court: (1) exercise its inherent authority to order HPD, MMWBR, and/or Mr. Ryan to pay Certain Defendants up to $279,070 as sanctions for filing and pursuing this frivolous action in bad faith; and/or (2) order Mr. Ryan pursuant to Section 1927 to pay Certain Defendants up to $174,860 as sanctions for unreasonably and vexatiously multiplying the proceedings in this action.

## V.   CONCLUSION

For all the foregoing reasons, Certain Defendants respectfully request that this Court grant this Motion for monetary sanctions.

Dated:  December 12, 2016                           NIXON PEABODY LLP


By:      */s/ John R. Foote*
GREGORY O'HARA (SBN: 131963)
JOHN R. FOOTE (SBN: 99674)
KARL K. SUNG  (SBN: 294120)
Attorneys for Certain Defendants